# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MISSOURI
## NORTHERN DIVISION

| | | |
|---|---|---|
| VERNON ULRICH, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No. 2:10CV89 JCH(LMB) |
| | ) | |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of Social Security, | ) | |
| | ) | |
| Defendant. | ) | |

## REPORT AND RECOMMENDATION
## OF UNITED STATES MAGISTRATE JUDGE

This is an action under 42 U.S.C. § 405(g) for judicial review of defendant's final decision denying the application of Vernon Ulrich for Disability Insurance Benefits under Title II of the Social Security Act. The cause was referred to the undersigned United States Magistrate Judge for a Report and Recommendation pursuant to 28 U.S.C. § 636 (b). Plaintiff has filed a Brief in Support of the Complaint. (Document Number 17). Defendant has filed a Brief in Support of the Answer. (Doc. No. 20).

## Procedural History

On September 5, 2007, plaintiff filed his application for benefits, claiming that he became unable to work due to his disabling condition on August 19, 2007. (Tr. 9). This claim was denied initially, and following an administrative hearing, plaintiff's claim was denied in a written opinion by an Administrative Law Judge (ALJ), dated September 18, 2009. (Tr. 45-46, 9-18). On November 2, 2010, the Appeals Council denied plaintiff's request for review. (Tr. 1-3).

- 1 -

Thus, the decision of the ALJ stands as the final decision of the Commissioner.  See 20 C.F.R. §§ 404.981, 416.1481.

## **Evidence Before the ALJ**

### A.    **ALJ Hearing**

Plaintiff's administrative hearing was held on April 21, 2009.  (Tr. 21).  Plaintiff was present and was represented by counsel.  (Id.).  Vocational expert Jeffrey Magrowski was also present.  (Id.).

The ALJ examined plaintiff, who testified that he was forty-three years of age.  (Tr. 22).  Plaintiff stated that he had completed twelve years of school and three years of college.  (Id.).  Plaintiff testified that he was five-feet ten-inches tall and weighed 140 pounds.  (Id.).  Plaintiff stated that his normal weight was 132 to 135 pounds.  (Tr. 23).  Plaintiff testified that he was right-hand dominant.  (Id.).

Plaintiff stated that he was not working at the time of the hearing.  (Id.).  Plaintiff testified that he last worked August 18, 2007, for Spartan Light Metals ("Spartan") in Mexico, Missouri.  (Id.).  Plaintiff stated that he first worked as a die-caster for Spartan and later worked in the dye services area.  (Id.).  Plaintiff testified that, when he worked in the dye services area, he tore down and rebuilt the injection mold dyes.  (Id.).  Plaintiff stated that he worked for Spartan for about eight months.  (Tr. 24).  Plaintiff testified that he left this position due to an injury he sustained.  (Tr. 26).

Plaintiff testified that prior to working for Spartan, he worked at Brookstone as a return specialist.  (Tr. 24).  Plaintiff stated that he processed returned products at this position.  (Id.).  Plaintiff testified that he worked at this position for four or five weeks.  (Id.).  Plaintiff stated that

he left this position because Spartan offered better pay.  (Id.).

Plaintiff stated that, prior to working at Brookstone, he worked in new home construction and remodeling in Iowa.  (Id.).  Plaintiff testified that he left this position and moved to Missouri to help take care of his father after his mother died.  (Tr. 25).  Plaintiff stated that his own physical problems were not a factor in his decision to leave this position.  (Id.).

Plaintiff testified that he worked for a steel tube manufacturing company for eighteen months prior to working construction.  (Tr. 25).  Plaintiff stated that he left this position due to a dispute with his employer.  (Id.).

Plaintiff testified that he was injured at home when he was working for Spartan.  (Tr. 26). Plaintiff stated that he was unloading a freezer when he slipped in wet grass and fell.  (Id.).

Plaintiff testified that he also had problems earlier in his life.  (Id.).  Plaintiff stated that he underwent surgery at an Iowa City veteran's hospital in 2005 for a ruptured disc in his L4-L5[1] area.  (Id.).  Plaintiff testified that he injured his back when he was climbing down scaffolding while he was working at a construction job.  (Id.).  Plaintiff state that he returned to light duty work eight weeks after surgery.  (Id.).

Plaintiff stated that he also underwent surgery in 1995.  (Id.).  Plaintiff testified that he injured at work when a hydraulic punch press struck him in the lower back.  (Tr. 27).  Plaintiff

---

[1]The back is comprised of the cervical, thoracic and lumbar regions.  In common terms, the cervical region of the spinal column is the neck; the thoracic region is the main part of the back; and the lumbar region is the lower back.  There are seven cervical vertebrae, twelve thoracic vertebrae, and five lumbar vertebrae.  The sacrum lies directly below the fifth lumbar vertebra. The coccyx, or tail bone, lies below the sacrum.  See Medical Information Systems for Lawyers § 6:27.

stated that he underwent a discectomy[2] at L4-L5.  (Id.).

Plaintiff testified that, since his most recent injury, he has been seeing his primary care provider at the Veteran's Administration Clinic.  (Id.).  Plaintiff stated that his doctor sent him to physical therapy, a neurosurgeon, and a pain management and rehabilitation specialist.  (Id.).

Plaintiff testified that the pain management physician performed an MRI with dye injections in a disc in his lower back.  (Tr. 28).  Plaintiff stated that testing revealed degenerative disc disease[3] and three ruptured discs at L3-4, L4-5 and L5-S1.  (Id.).

Plaintiff testified that he is discussing the possibility of a fusion surgery with the neurosurgeon.  (Id.).  Plaintiff stated that he is concerned about the outcome of the surgery.  (Tr. 28-29).

Plaintiff testified that sitting upright for long periods of time increases his back pain.  (Tr. 30).  Plaintiff stated that he is unable to stand or walk for more than fifteen or twenty minutes at a time due to lower back pain.  (Id.).  Plaintiff testified that his back pain radiates down through his hips and into his legs.  (Id.).  Plaintiff stated that he also has arthritic pain in his neck and shoulders.  (Id.).  Plaintiff testified that he is most comfortable sitting in his recliner.  (Tr. 31).  Plaintiff stated that he is able to sit comfortably for about an hour before he has to change positions.  (Id.).  Plaintiff testified that he usually gets up and moves around every twenty to thirty minutes.  (Id.).  Plaintiff stated that lying down is more comfortable than sitting or standing.  (Id.).  Plaintiff testified that he sits in his recliner for eight out of ten hours of his day.  (Id.).

---

[2]Excision, in part or in whole, of an intervertebral disc.  See Stedman's Medical Dictionary, 550 (28th Ed. 2006).

[3]A general term for both acute and chronic processes destroying the normal structure and function of the intervertebral discs.  See Medical Information Systems for Lawyers, § 6:201.

Plaintiff stated that he is barely able to lift a gallon of milk.  (Tr. 32).  Plaintiff testified that he is not able to carry anything heavier than a ten-pound bag of groceries.  (Id.).

Plaintiff stated that he is married and has a seventeen-year-old son.  (Id.).  Plaintiff testified that his wife had been living out of town since December 2008, but she planned to move back in June of 2009.  (Id.).  Plaintiff stated that his wife had worked at Wal-Mart but she was not sure where she would work upon moving back.  (Tr. 33).  Plaintiff testified that his son lives with him.  (Id.).

Plaintiff testified that he washes dishes occasionally, cooks meals, and puts clothes in the washer.  (Id.).  Plaintiff stated that his son puts the clothes in the dryer and vacuums.  (Id.).  Plaintiff testified that his step-daughter occasionally helps with household chores.  (Id.).  Plaintiff stated that his son is still in school.  (Tr. 34).  Plaintiff testified that he shops for groceries with his son and his son pushes the cart.  (Id.).  Plaintiff stated that he usually uses a wheelchair or electric scooter at the grocery store.  (Id.).  Plaintiff testified that he drives to the grocery store.  (Id.).  Plaintiff stated that he has no difficulty driving short distances.  (Id.).

Plaintiff testified that he receives Temporary Aid for Needy Families (TANF).  (Tr. 35).  Plaintiff stated that he was recently approved for Medicaid benefits.  (Id.).  Plaintiff testified that he has been receiving all of his treatment through the Veteran's Administration ("VA").  (Id.).

Plaintiff's attorney then examined plaintiff, who testified that he planned to continue receiving treatment through the VA even though he now had Medicaid benefits because he liked his doctors.  (Tr. 36).

Plaintiff stated that, over the past two years, he has had episodes where his pain improved but his pain eventually returns.  (Id.).  Plaintiff testified that he is never pain-free.  (Id.).  Plaintiff

stated that his pain varies from being tolerable to severe.  (<u>Id.</u>).  Plaintiff testified that when his pain is tolerable, he would rate his pain as a five on a scale of zero to ten.  (<u>Id.</u>).  Plaintiff stated that when his pain is severe, he would rate it as an eight.  (Tr. 37).

Plaintiff testified that he typically spends about eight hours out of ten in his recliner in a fully reclined position.  (<u>Id.</u>).  Plaintiff stated that on a good day, he gets up and moves around more.  (<u>Id.</u>).  Plaintiff testified that on a bad day, he only gets out of the recliner to use the bathroom and to eat.  (<u>Id.</u>).  Plaintiff stated that he has an equal amount of good days and bad days in an average month.  (<u>Id.</u>).

Plaintiff testified that he takes Tramadol, which causes side effects.  (Tr. 38).  Plaintiff stated that he feels like his skin is "crawling off," and he gets the jitters.  (<u>Id.</u>).

Plaintiff testified that he uses a TENS[4] unit that was prescribed by the VA.  (<u>Id.</u>).

Plaintiff's attorney noted that it appeared that plaintiff was unable to stand completely erect.  (<u>Id.</u>).  Plaintiff stated that, on a good day, he was able to stand upright and walk normally, but ninety percent of the time he walked hunched over.  (<u>Id.</u>).  Plaintiff testified that he was unable to sit straight up in a chair.  (Tr. 39).

Plaintiff stated that he would be unable to work every day even if he had an easy job where he was able to sit or stand.  (<u>Id.</u>).  Plaintiff testified that if he were able to work one day, he would then have to remain in his recliner for three days.  (<u>Id.</u>).

Plaintiff stated that he was unable to carry his wallet in his back pocket due to pain.  (<u>Id.</u>).  Plaintiff testified that his wallet throws his hips off balance and causes severe pain in his back that radiates down his right leg.  (<u>Id.</u>).

---

[4]A method of reducing pain by passage of an electric current.  <u>Stedman's</u> at 1838.

Plaintiff stated that standing in a hot shower helps relax his muscles and eases the pain for a few hours. (Tr. 40). Plaintiff testified that he takes a hot shower during the day when he is physically able to stand long enough to take a shower. (Id.).

When the ALJ asked plaintiff if he had anything else to add, plaintiff stated that he would like to return to work and that he missed being able to perform daily activities. (Id.).

The ALJ then examined the vocational expert, Dr. Magrowski. (Tr. 41). The ALJ asked Dr. Magrowski to assume that plaintiff were restricted to light work in that he could not lift anything over twenty pounds, and could lift items up to twenty pounds occasionally; was able to lift items up to ten pounds frequently; was unable to remain in a set position for a long period of time; would have to sit after being on his feet for a half-hour; after sitting a half-hour to forty-five minutes, he would have to get up; and if he were able to alternate positions throughout a workday, sitting or standing, he would be able to remain at a workstation with proper attention and concentration. (Tr. 41-42). Dr. Magrowski testified that plaintiff would be unable to perform his past work but he would be able to perform other unskilled jobs. (Tr. 42). Dr. Magrowski stated that plaintiff could perform work as a parking lot cashier (100,000 positions nationally, 1,200 positions in the state); order caller (20,000 positions nationally, 500 in the state); simple assembly work (50,000 positions nationally, 500 in the state); and packing work (17,000 positions nationally, 300 in the state). (Id.).

Dr. Magrowski testified that, if plaintiff were required to recline either in a recliner or lying down for a significant part of the day where he would be taken away from the workstation, he would be unable to perform any jobs. (Tr. 43).

**B.     Relevant Medical Records**

The record reveals that plaintiff presented to the Harry S. Truman VA Hospital ("VA") on August 19, 2007, with complaints of low back pain. (Tr. 190). Upon physical examination, plaintiff had full strength bilaterally, intact sensation, and no spinal pain or tenderness. (Id.). Dr. Vivek K. Manchanda diagnosed plaintiff with low back pain and history of degenerative disc disease. (Id.). Dr Manchanda administered a Toradol[5] injection and prescribed Tramadol. (Id.).

Plaintiff underwent an x-ray of the lumbosacral spine on August 19, 2007, which revealed marked narrowing of the L5-S1 disc space. (Tr. 164).

Plaintiff presented to the VA Medical Center in Mexico, Missouri, on August 24, 2007, for a follow-up regarding his low back pain. (Tr. 182). Plaintiff indicated that he injured his back while moving boxes two weeks prior. (Id.). Upon examination, plaintiff had limited forward flexion and extension of the back, was able to heel and toe walk but did this timidly, had a negative straight leg raise test, and no point tenderness. (Tr. 185). Brandy Lynn Worley, nurse practitioner, diagnosed plaintiff with low back pain. (Id.). Ms. Worley recommended non-steroidal anti-inflammatory drugs ("NSAID"), heat and ice, and physical therapy exercises. (Id.). Plaintiff received another Toradol injection. (Tr. 188).

Plaintiff saw Ms. Worley on August 31, 2007, for a follow-up regarding low back pain. (Tr. 182). Plaintiff reported that his pain was mildly improving and that he was no longer having cramps in his lower legs, although he complained of pain in both hips. (Id.). Upon examination, plaintiff had limited forward flexion and extension of his back, was able to heel and toe walk but did so timidly,

---

[5]Toradol is a non-steroidal anti-inflammatory drug indicated for the short-term treatment of moderate to severe pain. See WebMD, http://www.webmd.com/drugs (last visited November 18, 2011).

had negative straight leg raise test, and had pain with palpation of the right lower back. (Id.). Ms. Worley's assessment was low back pain. (Id.). Ms. Worley recommended NSAIDs for pain, heat and ice, physical therapy exercises, and walking. (Id.).

Plaintiff saw Ms. Worley on September 7, 2007, at which time he reported that his pain had been worse the past two days. (Tr. 180). Upon examination, plaintiff had limited forward flexion and extension of the back, and pain with palpation of the right lower back. (Tr. 181). Ms. Worley's assessment was low back pain. (Id.). She prescribed Ultram,[6] and recommended that plaintiff continue doing physical therapy exercises and walk. (Id.).

Plaintiff underwent an MRI of the lumbar spine on September 26, 2007, which revealed degenerative disc disease and postsurgical changes in the lumbar spine. (Tr. 165). Disc bulges were noted at L3-L4, L4-L5, and L5-S1. (Id.). At L4-L5, the bulge created a moderate impression on the thecal sac and moderate narrowing of the left neural foramina. (Id.). The disc bulge at L5-S1 contributed to moderate narrowing of the left neural foramina. (Id.). There was no evidence of spinal canal stenosis.[7] (Id.).

Plaintiff saw Ms. Worley on September 28, 2007, at which time plaintiff reported he continued to have back pain and that he had good days and bad days. (Tr. 178). Plaintiff also complained of radicular symptoms down both legs. (Id.). Upon examination, plaintiff had limited forward flexion and extension of the back and pain with palpation across the lower back. (Id.). Ms.

---

[6]Ultram is indicated for the treatment of moderate to moderately severe chronic pain in adults who require around-the-clock treatment of their pain for an extended period of time. See Physician's Desk Reference (PDR), 2429 (63rd Ed. 2009).

[7]Narrowing of the spinal canal. See Stedman's at 1832.

Worley prescribed Gabapentin,[8] and recommended that he continue physical therapy exercises and walking.  (Id.).

On October 23, 2007, plaintiff saw Dr. Gavin Vaughn at the Physical Medicine and Rehabilitation ("PM&R") Clinic at the VA.  (Tr. 168-71).  Plaintiff complained of an aching pain in his back, with some pain in his right buttock but denied any radiation into the posterior thigh or below the knee.  (Tr. 169).  Upon examination, Dr. Vaughn noted limited range of motion in flexion and extension secondary to pain, plaintiff walked in a flexed position with his knees bent but was able to come upright, plaintiff's straight leg raise testing was negative, and plaintiff's sensation was intact.  (Tr. 170).  Dr. Vaughn's assessment was lumbar strain with no evidence of radiculopathy.[9]  (Id.).  He recommended physical therapy and advised plaintiff to quit smoking.  (Id.).

Plaintiff attended physical therapy at the VA on October 23, 2007.  (Tr. 167).

Plaintiff attended physical therapy on October 30, 2007, at which time he reported that his pain was about the same.  (Tr. 161).  Plaintiff indicated that he had more pain into his right gluteal region and that he was unable to carry his wallet in his back pocket.  (Id.).

Plaintiff attended physical therapy on November 6, 2007, at which time he reported that his pain was about the same except that the pain seemed to be going down his buttock and into his upper thigh more often.  (Tr. 160).  Plaintiff stated that the pain radiates down if he walks too far.  (Id.).

Plaintiff attended physical therapy on November 20, 2007, at which time he reported that the TENS unit worked to a point but made him queasy if he left it on too long.  (Tr. 208).  Plaintiff rated his pain as a five out of ten and indicated that he was having radiating pain into his right buttocks.

---

[8]Gabapentin is indicated for the relief of nerve pain.  See WebMD, http://www.webmd.com/drugs (last visited November 18, 2011).

[9]Disorder of the spinal nerve roots.  Stedman's at 1622.

(Id.).  Plaintiff also complained of tingling in the web space between his first and second toes.  (Id.).

Plaintiff saw Ms. Worley on December 7, 2007, at which time he reported that he was doing a little better.  (Tr. 204).  Plaintiff indicated that the TENS unit was helpful and that his physical therapy exercises were painful.  (Id.).  Upon examination, plaintiff had limited forward flexion and extension of the back, and pain with palpation across the lower back.  (Id.).  Ms. Worley's assessment was low back pain.  (Tr. 205).  Ms. Worley continued the Tramadol for severe pain, and continued the physical therapy.  (Id.).

Plaintiff attended physical therapy on December 20, 2007, at which time he rated his pain as a three out of ten.  (Tr. 216).  Plaintiff complained of tingling in the webbing between his first and second toes.  (Id.).  Plaintiff indicated that he had been walking with more upright posture.  (Id.).  Plaintiff reported that he did his exercises until it starts to hurt.  (Id.).

In a letter dated December 27, 2007, Ms. Worley stated that plaintiff suffers from chronic back pain and recently experienced an acute flare of his back pain.  (Tr. 207).  Ms. Worley stated that plaintiff "is currently unable to go back to his full work duties because of his back condition."  (Id.).  Ms. Worley stated that plaintiff was not at maximum medical improvement at that time.  (Id.).  Ms. Worley indicated that plaintiff was undergoing physical therapy for his pain at that time.  (Id.).

Plaintiff attended physical therapy on January 10, 2008, at which time he reported  having more pain and rated his pain as a five out of ten.  (Tr. 212).  Plaintiff continued to complain of pain in the right gluteal and hip area and indicated that he canceled his last appointment because he did not want to move.  (Id.).  Plaintiff stated that his pain increases when he carries a jug of water from one room to another.  (Id.).  Plaintiff was still smoking.  (Id.).  The physical therapist stated that plaintiff's smoking was "further deteriorating his discs."  (Tr. 219).  It was noted that physical therapy would

not be able to offer plaintiff much more. (Id.). Consults with a pain clinic and a neurosurgeon were recommended. (Id.).

Plaintiff saw Dr. Vaughn at the PM&R Clinic on February 25, 2008, at which time plaintiff continued to complain of low back pain which worsened with activity. (Tr. 222). Upon examination, plaintiff's back range of motion was limited secondary to pain, his gait was smooth and symmetrical, plaintiff was able to heel and toe walk without difficulty, plaintiff's straight leg raise testing was negative, and plaintiff's sensation was intact. (Id.). Dr. Vaughn's assessment was chronic low back pain and bilateral iliolumbar ligament[10] enthesopathy.[11] (Tr. 223). Dr. Vaughn administered a steroid injection into the bilateral iliolumbar ligaments. (Id.).

Plaintiff saw Ms. Worley on March 13, 2008, at which time he reported that he had undergone dye injections in his back and his back was no better. (Tr. 224). Ms. Worley noted that plaintiff had seen a neurosurgeon and had undergone dye injections at the University of Missouri, and that she would request these records. (Id.). Upon physical exam, plaintiff ambulated without difficulty, had limited range of motion of the lower back, and tenderness with palpation of the right lower back. (Tr. 225). Ms. Worley's assessment was low back pain; and tobacco abuse. (Tr. 225). She recommended that plaintiff continue his exercises and continue the TENS unit. (Id.). Ms. Worley discussed with plaintiff the risks of smoking and encouraged cessation. (Id.).

Plaintiff saw Ms. Worley on June 10, 2008, at which time plaintiff continued to complain of pain in the back and bilateral hips. (Tr. 231). Plaintiff indicated that the neurosurgeon told him there

---

[10]The strong ligament that connects the fourth and fifth lumbar vertebrae with the ilium. Stedman's at 1085.

[11]A disease process occurring at the site of insertion of muscle tendons and ligaments into bones, or joint capsules. Stedman's at 649.

was nothing more he could offer. (Id.). Upon examination, plaintiff ambulated without difficulty, had a steady gait, upright posture, had limited range of motion of the lower back, and had tenderness with palpation of the lower back. (Id.). Ms. Worley recommended physical therapy exercises, walking, and continuing the TENS unit. (Tr. 232). She noted that the records from the neurosurgeon indicated that the neurosurgeon believed a fusion may provide some benefit but plaintiff elected to continue conservative treatment. (Id.).

Plaintiff saw Dr. Megan Noon at the PM&R Clinic on June 24, 2008, at which time he reported having good days and bad days. (Tr. 228). Plaintiff stated that on good days, he would walk around without difficulty, whereas on bad days he stays in his recliner for the majority of the day. (Id.). Plaintiff indicated that he walks a total of about two miles on good days. (Id.). Plaintiff complained of more frequent shooting pain into the right buttock, and occasional spasms across the low back when he is active. (Id.). Dr. Noon noted that plaintiff had seen a neurosurgeon and that he could undergo a L4-L5 fusion but did not want surgery at that time. (Id.). Upon examination, plaintiff had an antalgic gait[12] with forward flexed spine, flat feet, guarding and tenderness along the paraspinal spine at T8 with palpation, negative straight leg raise testing, and intact sensation. (Tr. 229). Dr. Noon's assessment was chronic low back pain with degenerative disc disease, back muscle spasms, depression, and tobacco abuse. (Tr. 230). Dr. Noon prescribed Skelaxin[13] for back spasms and recommended exercises. (Id.). Plaintiff indicated that he did not want an antidepressant. (Id.).

Plaintiff saw Ms. Worley on April 8, 2009, at which time plaintiff reported a flare of his low

---

[12]A characteristic gait resulting from pain on weight-bearing in which the stance phase of gait is shortened on the affected side. Stedman's at 781.

[13]Skelaxin is indicated for the treatment of acute, painful musculoskeletal conditions. See PDR at 1785.

back pain after twisting his back and feeling a snap in his right lower back. (Tr. 252). Plaintiff indicated that he had been taking over-the-counter pain medication, which was helping. (Id.). Plaintiff also complained of more muscle spasms. (Id.). Ms. Worley noted that plaintiff "got in some trouble with drug possession" in December of 2008. (Id.). Plaintiff reported that he was doing community service and was pushing a dust mop for a few hours a day. (Id.). Upon examination, plaintiff had limited range of motion of the lower back, stooped posture with a limp on the right, and tenderness with palpation down the spine. (Tr. 253). Ms. Worley's assessment was low back pain, tobacco abuse, and hypothyroidism. (Tr. 254). Ms. Worley prescribed Flexeril, continued the TENS unit, and recommended plaintiff continue taking the over-the-counter pain medication. (Id.). She also encouraged plaintiff to stop smoking. (Id.).

Plaintiff saw Craig S. Heligman, M.D. for a consultative medical examination at the request of the state agency on June 1, 2009. (Tr. 243-48). Plaintiff reported a history of back pain and a history of tendinitis[14] in his right wrist and forearm. (Tr. 244). Plaintiff stated that the tendinitis went away, although the right wrist continued to pop. (Id.). Plaintiff reported that he was diagnosed with bilateral osteoarthritis[15] of the wrists. (Id.). Plaintiff indicated that he wears a brace on the right wrist about fifty percent of the time. (Id.). Plaintiff reported that he was able to walk two hundred feet, stand for thirty minutes, sit for twenty minutes, lift and carry ten pounds, and drive a personal vehicle without restrictions. (Id.). Plaintiff reported no limitation in the ability to provide self-care and personal hygiene, and eat and prepare food, although he needed assistance from his children to clean

[14]Inflammation of a tendon. Stedman's at 1944.

[15]Arthritis characterized by erosion of articular cartilage, either primary or secondary to trauma or other conditions, which becomes soft, frayed, and thinned with eburnation of subchondral bone and outgrowths of marginal osteophytes; pain and loss of function result. Stedman's at 1388.

his residence.  (Id.).

Upon physical examination, plaintiff showed evidence of discomfort while seated in a chair or on the examination table.  (Tr. 245).  He moved slowly, showed difficulty with standing up straight, and was unable to sit without fidgeting or changing position.  (Tr. 245).  Plaintiff was able to mount and dismount from the examination table without assistance and was able to dress and undress without assistance.  (Id.).  Plaintiff was wearing a well worn wrist splint on the right wrist and a TENS unit.  (Id.).  Plaintiff was able to heel walk and tandem walk, and squat and rise without assistance.  (Id.).  Plaintiff was unable to demonstrate toe walk.  (Id.).  Plaintiff's gait and station was stooped/hunched posture with reciprocal gait pattern and with antalgia related to reported back pain.  (Id.).  Dr. Heligman noted reduced range of motion of the back with forward flexion, extension, and left and right lateral flexion; diffuse tenderness in the thoracic and lumbar paraspinal areas; and inconsistent straight leg raise testing.  (Id.).  Plaintiff had positive Waddell signs[16] in the areas of over-reaction, superficial tenderness, axial compression/rotation, and supine vs. sitting straight leg raising.  (Id.).  Plaintiff had full strength and range of motion at the shoulders, elbows, forearms, and wrists, except for a four out of five pinch on the right side.  (Id.).  Dr. Heligman administered psychometric screening tests, which in conjunction with the clinical examination findings suggested that plaintiff's perception of pain was somewhat inconsistent with what one would expect based upon clinical findings.  (Tr. 247).  Dr. Heligman diagnosed plaintiff with lumbago, status post lumbar discectomy, right hand osteoarthritis, history of substance abuse, and symptom magnification.  (Id.).  Dr.

---

[16]Waddell signs are physical signs used to detect non-anatomical components to chronic low back pain.  Three or more positive results correlates to the presence of non-organic factors, including possible malingering.  Hillery v. Ltd. Long-Term Disability Program, No. 4:04CV1718 CDP, 2005 WL 2346957, at *2 n.3 (E.D. Mo. Sept. 26, 2005) (citing Attorneys Medical Deskbook § 11:2 (3d ed. 2004)).

Heligman stated that plaintiff's level of ability regarding work-related activities was unclear. (Id.). He noted that plaintiff had poor posture and slow movements. (Id.). Dr. Heligman stated that plaintiff's gait and posture was inconsistent in clinic and compared to documented findings in records. (Id.). Dr. Heligman expressed the opinion that plaintiff is capable of functioning at least at the sedentary level of labor and may have greater ability. (Id.). Dr. Heligman found that plaintiff may use the upper extremities at will, although his tight/repetitive pinch grip with the right hand may be limited. (Id.). Dr. Heligman found that plaintiff had no limitations due to mental impairments. (Tr. 248).

Dr. Heligman completed a Medical Source Statement of Ability to Do Work-Related Activities (Physical), in which he expressed the opinion that plaintiff could frequently lift and carry up to ten pounds, occasionally lift and carry up to twenty pounds; sit for one hour at a time and sit a total of four hours in an eight-hour workday; stand thirty minutes at a time and stand a total of two hours in an eight-hour workday; and walk thirty minutes at a time and walk a total of two hours in an eight-hour workday. (Tr. 237). Dr. Heligman found that plaintiff could occasionally reach, handle, finger, feel, push, and pull with both hands. (Tr. 238). Dr. Heligman indicated that plaintiff should never operate foot controls with either foot, climb stairs and ramps, climb ladders or scaffolds, stoop, kneel, crouch, or crawl. (Tr. 238-39). Dr. Heligman also found that plaintiff should never be exposed to unprotected heights or moving mechanical parts and could only occasionally operate a motor vehicle. (Tr. 240). Dr. Heligman noted that plaintiff's overall behavior was inconsistent. (Id.). He stated that plaintiff's exam was inconsistent with diagnostic tests and findings documented in records. (Id.). Dr. Heligman concluded that plaintiff's exact functional capacity cannot be determined. (Id.).

# The ALJ's Determination

The ALJ made the following findings:

1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2012.

2. The claimant has not engaged in substantial gainful activity since August 19, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*).

3. The claimant has the following severe impairment: degenerative disc disease of the lumbar spine (20 CFR 404.1520(c)).

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1(20 CFR 404.1520(d), 404.1525 and 404.1526).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he must periodically alternate sitting and standing (need to alternate sit/stand option after 30 to 45 minutes).

6. The claimant is unable to perform any past relevant work (20 CFR 404.1565).

7. The claimant was born on April 5, 1966 and was 41 years old, which is defined as a younger individual age 18-49, on the alleged disability onset date (20 CFR 404.1563).

8. The claimant has at least a high school education and is able to communicate in English (20 CFR 404.1564).

9. Transferability of job skills is not material to the determination of disability because using the Medical-Vocational Rules as a framework supports a finding that the claimant is "not disabled," whether or not the claimant has transferable job skills (See SSR 82-41 and 20 CFR Part 404, Subpart P, Appendix 2).

10. Considering the claimant's age, education, work experience, and residual functional capacity, there are jobs that exist in significant numbers in the national economy that the claimant can perform (20 CFR 404.1569 and 404.1569(a)).

11. The claimant has not been under a disability, as defined in the Social Security Act, from August 19, 2007 through the date of this decision (20 CFR 404.1520(g)).

(Tr. 11-17).

The ALJ's final decision reads as follows:

> Based on the application for a period of disability and disability insurance benefits filed on September 5, 2007, the claimant is not disabled under sections 216(I) and 223(d) of the Social Security Act.

(Tr. 18).

## Discussion

### A.    Standard of Review

Judicial review of a decision to deny Social Security benefits is limited and deferential to the agency.  See Ostronski v. Chater, 94 F.3d 413, 416 (8th Cir. 1996).  The decision of the SSA will be affirmed if substantial evidence in the record as a whole supports it.  See Roberts v. Apfel, 222 F.3d 466, 468 (8th Cir. 2000).  Substantial evidence is less than a preponderance, but enough that a reasonable mind might accept it as adequate to support a conclusion.  See Kelley v. Callahan, 133 F.3d 583, 587 (8th Cir. 1998).  If, after review, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the denial of benefits must be upheld.  See Robinson v. Sullivan, 956 F.2d 836, 838 (8th Cir. 1992).  The reviewing court, however, must consider both evidence that supports and evidence that detracts from the Commissioner's decision. See Johnson v. Chater, 87 F.3d 1015, 1017 (8th Cir. 1996) (citing Woolf v. Shalala, 3 F.3d 1210, 1213 (8th Cir. 1993)).  "[T]he court must also take into consideration the weight of the evidence in the record and apply a balancing test to evidence which is contrary." Burress v. Apfel, 141 F.3d 875, 878 (8th Cir. 1998).  The analysis required has been described as a "searching inquiry."  Id.

**B.     The Determination of Disability**

The Social Security Act defines disability as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 416 (I) (1) (a); 42 U.S.C. § 423 (d) (1) (a).  The claimant has the burden of proving that s/he has a disabling impairment.  See Ingram v. Chater, 107 F.3d 598, 601 (8th Cir. 1997).

The SSA Commissioner has established a five-step process for determining whether a person is disabled.  See 20 C.F.R. §§ 404.1520, 416.920; Bowen v. Yuckert, 482 U.S. 137, 141-42, 107 S. Ct. 2287, 2291, 96 L. Ed. 2d. 119 (1987); Fines v. Apfel, 149 F.3d 893, 894-895 (8th Cir. 1998). First, it is determined whether the claimant is currently engaged in "substantial gainful employment." If the claimant is, disability benefits must be denied.  See 20 C.F.R. §§ 404.1520, 416.920 (b).  Step two requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments.  See 20 C.F.R §§ 404.1520 (c)), 416.920 (c)).  To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities."  Id.  Age, education and work experience of a claimant are not considered in making the "severity" determination.  See id.

If the impairment is severe, the next issue is whether the impairment is equivalent to one of the listed impairments that the Commissioner accepts as sufficiently severe to preclude substantial gainful employment.  See 20 C.F.R. §§ 404.1520 (d), 416.920 (d).  This listing is found in Appendix One to 20 C.F.R. 404.  20 C.F.R. pt. 404, subpt. P, App. 1.  If the impairment meets or equals one of the listed impairments, the claimant is conclusively presumed to be impaired.  See 20 C.F.R. §§

404.1520 (d), 416.920 (d).  If it does not, however, the evaluation proceeds to the next step which inquires into whether the impairment prevents the claimant from performing his or her past work.  See 20 C.F.R. § 404.1520 (e), 416.920 (e).  If the claimant is able to perform the previous work, in consideration of the claimant's residual functional capacity (RFC) and the physical and mental demands of the past work, the claimant is not disabled.  See id.  If the claimant cannot perform his or her previous work, the final step involves a determination of whether the claimant is able to perform other work in the national economy taking into consideration the claimant's residual functional capacity, age, education and work experience.  See 20 C.F.R. §§ 404.1520 (f), 416.920 (f).  The claimant is entitled to disability benefits only if s/he is not able to perform any other work.  See id.  Throughout this process, the burden remains upon the claimant until s/he adequately demonstrates an inability to perform previous work, at which time the burden shifts to the Commissioner to demonstrate the claimant's ability to perform other work.  See Beckley v. Apfel, 152 F.3d 1056, 1059 (8th Cir. 1998).

The Commissioner has supplemented this five-step process for the evaluation of claimants with mental impairments.  See 20 C.F.R. §§ 404.1520a (a), 416.920a (a).  A special procedure must be followed at each level of administrative review.  See id.  Previously, a standard document entitled "Psychiatric Review Technique Form" (PRTF), which documented application of this special procedure, had to be completed at each level and a copy had to be attached to the ALJ's decision, although this is no longer required.  See 20 C.F.R. §§ 404.1520a (d), (d) (2), (e), 416.920a (d), (d) (2), (e); 65 F.R. 50746, 50758.  Application of the special procedures required is now documented in the decision of the ALJ or Appeals Council.  See 20 C.F.R. §§ 404.1520a (e), 416.920a (e).

The evaluation process for mental impairments is set forth in 20 C.F.R. §§ 404.1520a,

416.920a. The first step requires the Commissioner to "record the pertinent signs, symptoms, findings, functional limitations, and effects of treatment" in the case record to assist in the determination of whether a mental impairment exists. See 20 C.F.R. §§ 404.1520a (b) (1), 416.920a (b) (1). If it is determined that a mental impairment exists, the Commissioner must indicate whether medical findings "especially relevant to the ability to work are present or absent." 20 C.F.R. §§ 404.1520a (b) (2), 416.920a (b) (2). The Commissioner must then rate the degree of functional loss resulting from the impairments in four areas deemed essential to work: activities of daily living, social functioning, concentration, and persistence or pace. See 20 C.F.R. §§ 404.1520a (b) (3), 416.920a (b) (3). Functional loss is rated on a scale that ranges from no limitation to a level of severity which is incompatible with the ability to perform work-related activities. See id. Next, the Commissioner must determine the severity of the impairment based on those ratings. See 20 C.F.R. §§ 404.1520a (c), 416.920a (c). If the impairment is severe, the Commissioner must determine if it meets or equals a listed mental disorder. See 20 C.F.R. §§ 404.1520a(c)(2), 416.920a(c)(2). This is completed by comparing the presence of medical findings and the rating of functional loss against the paragraph A and B criteria of the Listing of the appropriate mental disorders. See id. If there is a severe impairment but the impairment does not meet or equal the listings, then the Commissioner must prepare a residual functional capacity assessment. See 20 C.F.R. §§ 404.1520a (c)(3), 416.920a (c)(3).

## C.   Plaintiff's Claims

Plaintiff first argues that the ALJ erred in failing to develop the record. Plaintiff next contends that the ALJ erred in assessing the credibility of plaintiff's subjective complaints of pain and limitation. Plaintiff finally argues that the ALJ erred in determining plaintiff's residual functional

capacity. The undersigned will discuss plaintiff's claims in turn.

1.    **Duty to Develop the Record**

Plaintiff argues that the ALJ erred in failing to develop the record regarding plaintiff's hand and wrist impairment and lumbar spine impairment.

"It is settled law in this circuit that social security hearings are nonadversarial, and the ALJ is responsible, independent of the claimant's burden, for fully and fairly developing the record." Baker v. Barnhart, 457 F.3d 882, 895 (8th Cir. 2006). The duty to develop the record extends to cases like this one where the claimant is represented by counsel. Id. The duty to develop the record may include seeking clarification from treating physicians if a crucial issue is undeveloped or underdeveloped. See Stormo v. Barnhart, 377 F.3d 801, 806 (8th Cir. 2004). An ALJ does not breach his duty to develop the record when the record before him contains sufficient evidence from which to make an informed decision. See Tellez v. Barnhart, 403 F.3d 953, 956-57 (8th Cir. 2005).

Plaintiff first argues that the ALJ failed to fully develop the record regarding his ability to use his wrists and hands. The ALJ found that plaintiff's right wrist osteoarthritis was not severe. (Tr. 14).

Step two of the sequential evaluation process requires a determination of whether the claimant suffers from a medically severe impairment or combination of impairments. See 20 C.F.R §§ 404.1520 (c), 416.920 (c). To qualify as severe, the impairment must significantly limit the claimant's mental or physical ability to do "basic work activities." Id. While the burden is not great, the claimant bears the burden at step two to demonstrate a severe impairment that significantly limits the ability to perform basic work activities. See Mittlestedt v. Apfel, 204 F.3d 847, 852 (8th Cir. 2000); Caviness v. Massanari, 250 F.3d 603, 605 (8th Cir. 2001). Severity is not a "toothless standard," and

the Eighth Circuit has upheld on numerous occasions the Commissioner's finding that a claimant failed to make this showing. Kirby v. Astrue, 500 F.3d 705, 708 (8th Cir. 2007). See, e.g. Dixon v. Barnhart, 353 F.3d 602, 605 (8th Cir. 2003); Simmons v. Massanari, 264 F.3d 751, 755 (8th Cir. 2001); Gwathney v. Chater, 104 F.3d 1043, 1045 (8th Cir. 1997); Nguyen v. Chater, 75 F.3d 429, 431 (8th Cir. 1996). The sequential evaluation process may be terminated at step two when the claimant's impairment or combination thereof would have no more than a minimal effect on the claimant's ability to work. See Simmons, 264 F.3d at 755.

In determining whether plaintiff's right wrist osteoarthritis was severe, the ALJ first pointed out that plaintiff did not complain to any of his treating medical providers at the VA regarding a wrist problem. (Tr. 14). Rather, plaintiff did not report his history of tendinitis in the right wrist until his post-hearing June 2009 consultative examination. (Tr. 14, 244). The ALJ stated that the only abnormalities noted on exam were in plaintiff's lumbar spine. (Id.). The ALJ pointed out that plaintiff reported that he was capable of his own self-care and personal hygiene, was able to eat and prepare food, was able to dress and undress without assistance, and could occasionally operate a motor vehicle. (Tr. 14). The ALJ noted that Dr. Heligman found that plaintiff could use the upper extremities at will, although tight or repetitive pinch grip with the right hand may be limited. (Tr. 14, 247). The ALJ pointed out that Dr. Heligman indicated in a second medical source statement that plaintiff could occasionally reach including overhead, handle, finger, feel push, and pull. (Tr. 14, 238). The ALJ next noted that Dr. Heligman's finding that plaintiff's overall behavior was inconsistent and his exam was inconsistent with diagnostic tests and findings in his records. (Id.). The ALJ concluded from all the evidence that plaintiff's osteoarthritis of the right wrist was not severe. (Id.).

The undersigned finds that the ALJ did not breach his duty to develop the record regarding plaintiff's wrist and hand impairment because the record before him contained sufficient evidence from which to make an informed decision. The ALJ provided a thorough summary of the evidence of record in determining whether plaintiff's right wrist osteoarthritis was severe. The ALJ discussed Dr. Heligman's findings on examination and his opinion regarding plaintiff's functional limitations. The ALJ also discussed plaintiff's own testimony regarding his daily activities and limitations. Significantly, the ALJ pointed out that plaintiff made no complaints regarding his right wrist or hand to any of his medical providers at the VA and did not mention his history of tendinitis until after the hearing. As such, substantial evidence supports the ALJ's finding that plaintiff's right hand and wrist impairment was not severe and resulted in no work-related restrictions.

Plaintiff next argues that the ALJ erred in failing to obtain additional evidence regarding plaintiff's lumbar spine impairment. Specifically, plaintiff points out that his VA records indicate that dye was injected into his back in March 2008, which resulted in no improvement. (Tr. 224). Plaintiff also notes that his nurse practitioner, Ms. Worley, quoted from a neurosurgeon's records on May 8, 2008, in which the surgeon indicated that plaintiff may receive some benefit from a third back surgery. (Tr. 232). Plaintiff argues that these two pieces of evidence were important to the disposition of the case and the ALJ erred in failing to obtain them.

The undersigned finds that there was sufficient evidence in the record regarding plaintiff's back impairment from which the ALJ could make an informed decision. The ALJ reviewed extensive records from plaintiff's treating physicians, treating nurse practitioner, and physical therapists regarding his back impairment. These records include treatment notes from physical examinations and findings from imaging of the back. Also before the ALJ was the thorough report of consultative

physician Dr. Heligman, which included an opinion on plaintiff's ability to perform work-related activities. Plaintiff had the opportunity to submit these additional records to the ALJ or to the Appeals Council if he believed they would have been useful. In light of the significant amount of evidence in the record regarding plaintiff's back impairment, plaintiff has failed to demonstrate that the failure of the ALJ to obtain these records was prejudicial.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## 2. Credibility Analysis

Plaintiff next argues that the ALJ erred in assessing the credibility of his subjective complaints of pain and limitation. Specifically, plaintiff contends that the ALJ improperly analyzed his daily activities and smoking.

While the claimant has the burden of proving that the disability results from a medically determinable physical or mental impairment, direct medical evidence of the cause and effect relationship between the impairment and the degree of claimant's subjective complaints need not be produced." Polaski v. Heckler, 739 F.2d 1320, 1322 (8th Cir. 1984). Although an ALJ may reject a claimant's subjective allegations of pain and limitation, in doing so the ALJ "must make an express credibility determination detailing reasons for discrediting the testimony, must set forth the inconsistencies, and must discuss the Polaski factors." Kelley, 133 F.3d at 588. Polaski requires the consideration of: (1) the claimant's daily activities; (2) the duration, frequency, and intensity of the pain; (3) aggravating and precipitating factors; (4) dosage, effectiveness and side effects of the medication; and (5) functional restrictions. Polaski, 739 F.2d at 1322. See also Burress, 141 F.3d at 880; 20 C.F.R. § 416.929.

The court finds that the ALJ's credibility determination regarding plaintiff's subjective complaints of pain and limitations is supported by substantial evidence in the record as a whole. "[T]he question is not whether [plaintiff] suffers any pain; it is whether [plaintiff] is fully credible when she claims that [the pain] hurts so much that it prevents her from engaging in her prior work." Benskin v. Bowen, 830 F.2d 878, 883 (8th Cir. 1987). Thus, the relevant inquiry is whether or not plaintiff's complaints of pain to a degree of severity to prevent him from working are credible.

In his opinion, the ALJ properly discussed the Polaski factors and pointed out inconsistencies in the record as a whole that detract from plaintiff's complaints of disabling pain. The ALJ first discussed plaintiff's daily activities. The ALJ noted that plaintiff testified that he performed household chores and drove. (Tr. 16, 33-34). The ALJ also noted that plaintiff reported to Dr. Heligman that he was able to walk two hundred feet, stand thirty minutes, sit twenty minutes, lift and carry ten pounds, and drive a private personal vehicle without restrictions, attend to his own self-care and personal hygiene, and prepare food. (Tr. 16). Plaintiff argues that the ALJ erred in evaluating his daily activities because plaintiff's daily activities were not consistent with the performance of light work. The ALJ, however, did not rely on plaintiff's daily activities in finding that he was capable of performing light work.

The ALJ next pointed out that plaintiff failed to follow treatment recommendations, in that he smoked one half to one package of cigarettes a day. (Tr. 16). Plaintiff's medical providers consistently advised him to quit smoking, but plaintiff continued to smoke. (Tr. 170, 230, 254, 219, 225). Failure to follow a prescribed course of treatment may detract from a claimant's credibility. See O'Donnell v. Barnhart, 318 F.3d 811, 819 (8th Cir. 2003). The ALJ also noted that plaintiff's continued smoking contributed to further deterioration of plaintiff's musculoskeletal system. (Id.).

Plaintiff argues that the ALJ failed to cite any evidence supporting the statement that plaintiff's smoking contributed to his musculoskeletal disability. The ALJ, however, did cite to a physical therapy note dated January 10, 2008, which states "[plaintiff] continued to smoke which is further deteriorating his discs." (Tr. 12, 219). As such, the ALJ properly considered plaintiff's continued smoking in determining his credibility.

The ALJ also considered the objective medical evidence. Although the ALJ may not discount subjective complaints solely because they are not fully supported by the objective medical evidence, the lack of supporting objective medical evidence may be considered as a factor in evaluating the claimant's credibility. See Curran-Kicksey v. Barnhart, 315 F.3d 964, 968 (8th Cir. 2003). The ALJ noted that, although surgery had been recommended for his back impairment, plaintiff chose to pursue conservative treatment including heat and ice, a TENS unit, physical therapy, and exercise. The ALJ properly found that plaintiff's choice to receive conservative treatment detracted from his complaints of disabling pain. See Smith v. Shalala, 987 F.2d 1371, 1374 (8th Cir. 1993). In addition, plaintiff's physical examinations from VA providers consistently revealed negative straight leg raise testing, intact sensation, and full strength. (Tr. 190, 185, 182, 170, 222, 229).

Finally, and most significantly, the ALJ properly considered that Dr. Heligman diagnosed plaintiff with symptom magnification. (Tr. 247). Dr. Heligman noted that plaintiff had positive Waddell signs in the areas of over-reaction, superficial tenderness, axial compression/rotation, and supine vs. sitting straight leg raising. (Tr. 245). Dr. Heligman administered psychometric screening tests, which in conjunction with the clinical examination findings suggested that plaintiff's perception of pain was somewhat inconsistent with what one would expect based upon clinical findings. (Tr. 247). Dr. Heligman noted that plaintiff's gait and posture were inconsistent in clinic and compared

to documented findings in records. (Id.). Dr. Heligman further stated that plaintiff's overall behavior was inconsistent. (Tr. 240). Dr. Heligman's report noting evidence of symptom magnification detracts significantly from plaintiff's subjective complaints of disabling pain.

An administrative opinion must establish that the ALJ considered the appropriate factors. See Holley v. Massanari, 253 F.3d 1088, 1092 (8th Cir. 2001). However, each and every Polaski factor need not be discussed in depth, so long as the ALJ points to the relevant factors and gives good reasons for discrediting a claimant's complaints. See Dunahoo v. Apfel, 241 F.3d 1033, 1038 (8th Cir. 2001). In this case, the reasons given above by the ALJ for discrediting plaintiff's complaints of disabling pain are sufficient and his finding that plaintiff's complaints are not entirely credible is supported by substantial evidence.

Accordingly, the undersigned recommends that the decision of the Commissioner denying plaintiff's benefits be affirmed as to this point.

## 3.    Residual Functional Capacity

Plaintiff argues that the ALJ erred in determining plaintiff's residual functional capacity ("RFC"). Specifically, plaintiff contends that the ALJ's determination is not supported by any medical evidence.

Determination of residual functional capacity is a medical question and at least "some medical evidence 'must support the determination of the claimant's [residual functional capacity] and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace.'" Hutsell v. Massanari, 259 F.3d 707, 712 (8th Cir. 2001) (quoting Lauer v. Apfel, 245 F.3d 700, 704 (8th Cir. 2001)). Further, determination of residual functional capacity is "based on all the evidence in the record, including 'the medical records, observations of treating physicians and others, and an

individual's own description of his limitations.'" Krogmeier v. Barnhart, 294 F.3d 1019, 1024 (8th Cir. 2002) (quoting McKinney v. Apfel, 228 F.3d 860, 863 (8th Cir. 2000)). Similarly, in making a finding of residual functional capacity, an ALJ may consider non-medical evidence, although the residual functional capacity finding must be supported by *some* medical evidence. See Lauer**,** 245 F.3d at 704.

> The ALJ made the following determination regarding plaintiff's residual functional capacity:

> After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform light work as defined in 20 CFR 404.1567(b) except he must periodically alternate sitting and standing (need to alternate sit/stand option after 30 to 45 minutes).

(Tr. 14).

Plaintiff contends that RFC is a medical determination which requires some medical evidence. While the formulation of RFC is a medical question, Nevland v. Apfel, 204 F.3d 853, 858 (8th Cir. 2000), it is based on all the relevant, credible evidence of record including the medical records, observations of treating physicians and others, and an individual's own description of limitations. See McKinney, 228 F.3d at 863. "It is the claimant's burden, and not the Social Security Commissioner's burden, to prove the claimant's RFC." Baldwin v. Barnhart, 349 F.3d 549, 556 (8th Cir. 2003).

In support of his RFC determination, the ALJ first discussed plaintiff's credibility and found that plaintiff's subjective complaints were not entirely credible, a finding that the undersigned has found is supported by substantial evidence. The ALJ next discussed the medical opinion evidence. The ALJ pointed out that Dr. Heligman found that plaintiff was capable of performing at least sedentary work and may have greater ability. (Tr. 247). The ALJ also noted that Dr. Heligman found in the main body of his report that plaintiff had unrestricted use of his hands and arms. (Id.). The ALJ indicated that he was crediting Dr. Heligman's assessment. (Id.). Finally, the ALJ stated

that he was assigning greater weight to Dr. Heligman's report than to the opinion of plaintiff's nurse practitioner, Ms. Worley. (Id.).

In analyzing medical evidence, "[i]t is the ALJ's function to resolve conflicts among 'the various treating and examining physicians.'" Johnson v. Apfel, 240 F.3d 1145, 1148 (8th Cir. 2001) (quoting Bentley v. Shalala, 52 F.3d 784, 787 (8th Cir. 1995)). "Ordinarily, a treating physician's opinion should be given substantial weight." Rhodes v. Apfel, 40 F. Supp.2d 1108, 1119 (E.D. Mo. 1999) (quoting Metz v. Halala, 49 F.3d 374, 377 (8th Cir. 1995)). Further, a treating physician's opinion will typically be given controlling weight when the opinion is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] record." Prosch v. Apfel, 201 F.3d 1010, 1012-1013 (8th Cir. 2000) (quoting 20 C.F.R. § 404.1527 (d)(2) (bracketed material in original). Such opinions, however, do "not automatically control, since the record must be evaluated as a whole." Id. at 1013 (quoting Bentley, 52 F.3d at 785-786). Opinions of treating physicians may be discounted or disregarded where other "medical assessments 'are supported by better or more thorough medical evidence.'" Id. (quoting Rogers v. Chater, 118 F.3d 600, 602 (8th Cir. 1997)).

The undersigned finds that the ALJ properly analyzed the opinions of Dr. Heligman and Ms. Worley. As the ALJ pointed out, Dr. Heligman's opinion was supported by his examination and detailed findings. The December 2007 opinion of Ms. Worley, however, was unsupported by any objective findings or treatment notes. Ms. Worley simply authored a letter stating that plaintiff was "currently unable to go back to his full work duties because of his back condition." (Tr. 207). As such, the ALJ did not err in assigning more weight to the opinion of Dr. Heligman than the conclusory opinion of Ms. Worley.

The residual functional capacity assessed by the ALJ is supported by substantial evidence. The ALJ's determination is supported by the opinion of Dr. Heligman, who found that plaintiff was capable of performing *at least* sedentary work and may have greater ability. Significantly, Dr. Heligman diagnosed plaintiff with symptom magnification, which supports his finding that plaintiff was likely capable of performing more than sedentary work. Further, as previously discussed, by his choice, plaintiff received only conservative medical treatment for his back impairment. Thus, the limitations found by the ALJ are consistent with the record as a whole, including the objective medical record and the factors detracting from plaintiff's credibility.

Accordingly, the undersigned recommends that the decision of the Commissioner be affirmed as to this point.

## RECOMMENDATION

**IT IS HEREBY RECOMMENDED** that the decision of the Commissioner denying plaintiff's application for Disability Insurance Benefits under Title II of the Social Security Act be **affirmed**.

The parties are advised that they have fourteen (14) days in which to file written objections to this Report and Recommendation pursuant to 28 U.S.C. § 636 (b) (1), unless an extension of time for good cause is obtained, and that failure to file timely objections may result in a waiver of the right to appeal questions of fact. <u>See</u> Thompson v. Nix, 897 F.2d 356 (8th Cir. 1990).

Dated this __2nd__ day of December, 2011.

*Lewis M. Blanton*

LEWIS M. BLANTON
UNITED STATES MAGISTRATE JUDGE